(844 P.2d 724)

No. 67,128

STEVEN MICHAEL LATERRA, a Minor, by and through COMMER-
CIAL NATIONAL BANK and CAROLE GREENE, as Coconservators
of the Conservatorship of STEVEN MICHAEL LATERRA, *Appellee*,
v. STEVEN D. TREASTER, as Special Administrator for the Estate
of SHERYL STEERE, Deceased, *Appellant.*

Opinion filed December 18, 1992.

*Leonard R. Frischer* and *Lee Hardee*, of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, for appellant.

*Benjamin M. Kieler* and *Victor A. Bergman*, of Shamberg, Johnson, Bergman & Morris, Chartered, of Overland Park, for appellee.

Before GERNON, P.J., DAVIS and RULON, JJ.

GERNON, J.: Steven D. Treaster, as special administrator for the estate of Sheryl Steere, (Treaster) appeals from a jury verdict which awarded $500,000 to Steven Michael Laterra in a wrongful death action against Steere's estate.

## FACTS

The underlying facts are tragic and undisputed. On July 11, 1989, Sheryl Steere committed suicide. She died in her garage from carbon monoxide fumes after starting her car and allowing the engine to run with the garage door closed. The tragedy of her death was compounded by the fact that she lived in one-half of a duplex. Steven Ray Laterra (Laterra) lived in the other half. Laterra, who was sleeping in his residence, died as a result of the exhaust fumes. Laterra's son, Steven Michael Laterra (Michael), brought an action by and through his mother, Carole Greene, alleging that the wrongful death of his father and the subsequent damage and loss Michael sustained were the proximate result of Steere's negligence.

The focus of evidence at trial was not on how the death occurred, as the facts were stipulated to by the parties, but rather on the loss Michael suffered due to his father's death. Treaster conceded that Steere's actions caused Laterra's death. A jury returned a verdict awarding $500,000 in compensatory damages for the pecuniary losses Michael suffered as a result of his father's

death. After a motion for a new trial was overruled by the trial court, Treaster appealed.

## ISSUES

On appeal, Treaster contends the court erred as follows: (1) by initially precluding defense counsel from introducing evidence regarding Laterra's previous criminal activity; (2) by admitting evidence of the existence and value of certain real property owned in joint tenancy by Laterra and his mother; (3) by allowing witnesses to testify as to statements made by Laterra prior to his death; (4) by directing a verdict against Treaster on the theory of strict liability; (5) by instructing the jury it could award Michael damages for future support beyond the age of majority; and (6) by refusing to instruct the jury that all awards for future damages were to be reduced to present value.

## PRIOR CRIMINAL ACTIVITY

Prior to trial, Michael's attorney filed a motion in limine to preclude Treaster from making any use at trial of Laterra's guilty plea and conviction on a charge of indecent liberties with a child.

Michael's attorney argued that evidence of the prior conviction should not be admitted because it was not relevant to the issues of damages, because it would cause confusion as to the real issues in the case, and because the evidence was of a highly inflammatory nature. Treaster argued the evidence should be admissible because the conviction was directly relevant as to Laterra's earning capacity and future employment. Treaster also claimed that the conviction questioned the value of Laterra's contribution as a parental care giver, moral trainer, and source of guidance for his minor son.

The court accepted an affidavit from Laterra's former employer stating that she was aware of the conviction and that such knowledge had not prejudiced Laterra's continued employment or prospects for future advancement and increased earnings with her. The court then ruled that evidence of the conviction was not to be admitted due to its prejudicial nature unless Michael's counsel opened the door by eliciting testimony that Laterra was a good, moral, and law-abiding person.

On the second day of trial, the trial court, sua sponte, ruled that the door had been opened and allowed a journal entry of Laterra's conviction to be introduced.

On appeal, Treaster argues that, although the court ultimately allowed into evidence information concerning the conviction, the ruling came too late. Treaster claims that, by the time the evidence came in, the entire tone of the case had been established and the jury already had an untarnished image of Laterra which could not be effectively attacked by cross-examination at such a late stage in the proceedings.

"Subject to certain exclusionary rules, the admission of evidence lies within the sound discretion of the trial court." *McGuire v. Sifers*, 235 Kan. 368, 371, 681 P.2d 1025 (1984). "[A] trial judge has discretion to exclude otherwise relevant evidence when . . . it may unfairly prejudice a jury, or its probative value is outweighed by its prejudicial effect." *Doty v. Wells*, 9 Kan. App. 2d 378, 379-80, 682 P.2d 672, *rev. denied* 235 Kan. 1041 (1984).

We find no abuse of discretion in the way the trial court handled this delicate matter at trial. Although the conviction was arguably relevant and, therefore, admissible to show earning capacity, the trial court obviously weighed that factor against the possibility of prejudice and excluded the evidence until a later time.

"[T]he primary purpose of the motion in limine is to prevent prejudice during trial." *State v. Quick*, 226 Kan. 308, 311, 597 P.2d 1108 (1979). Such an order is temporary in nature and is entered before trial when no one knows exactly what will turn up later during trial. "It is possible events during the trial, bearing directly on questions of relevance, may support a change in the protective order." 226 Kan. at 312.

Here, the trial court did not err by granting Michael's motion in limine, nor did the trial court err in changing its order. Once evidence of the conviction was admitted, Treaster had a full and fair opportunity to cross-examine witnesses on this issue. Treaster has failed to demonstrate any substantial prejudice.

## VALUE OF REAL PROPERTY

Laterra's mother, Bonnie Laterra, testified as to a list of prop-

erties she owned in joint tenancy with Laterra, as well as property she owned solely. Bonnie Laterra testified as to the estimated value of each property and the estimated equity in the properties at the time of Laterra's death.

Treaster objected to the admission of this evidence on the grounds the information was not relevant or material to the proceedings and allowed the jury to translate entirely speculative information into a direct award of damages which unjustly inflated the jury's award for loss of financial support. Treaster claims admission of the evidence was erroneous for two reasons: (1) Michael was not legally entitled to the benefits, value, or equity of the properties upon Laterra's death; and (2) Michael cannot show any reasonable expectation to receive these specific benefits.

The court ruled that the evidence was relevant to the issues in the case, and our standard of review upon such a challenge is whether the trial court abused its discretion. *State v. Smith*, 225 Kan. 796, 801, 594 P.2d 218 (1979). "The determination of relevancy is a 'matter of logic and experience, not a matter of law.' " *Smelko v. Brinton*, 241 Kan. 763, 767-68, 740 P.2d 591 (1987).

Michael's counsel argued that the evidence presented was highly probative of Laterra's extensive practical skills and abilities in construction-related activities. The evidence demonstrated that Laterra would buy inexpensive, run-down homes and fix them up himself, which significantly increased their market value. The evidence reflected Laterra's industriousness and productivity, as well as his propensity for creating personal financial growth.

The evidence further indicates that this information was relevant due to the unique relationship between Laterra and his mother Bonnie and his plans for Michael.

So far as the value of the property is concerned, Bonnie Laterra, as the landowner, was fully competent to testify as to the value of her property. See *State Highway Commission v. Lee*, 207 Kan. 284, 297, 485 P.2d 310 (1971).

We conclude that these factors were relevant to Michael's claim of loss of future financial contributions, as well as loss of parental training and guidance. The trial court did not abuse its discretion in admitting evidence of the existence and value of the real property.

## STATEMENTS OF LATERRA PRIOR TO HIS DEATH

Several witnesses testified, over Treaster's objection, concerning statements allegedly made by Laterra prior to his death. These statements focused on Laterra's intent to pay for Michael's college education, what provisions, if any, Laterra had made in the event of his death, and what long-term career plans Laterra had made. Although Michael's parents were divorced, Michael's mother, Carole Greene, testified: "[Laterra] wanted Michael to be able to go to college after high school if he so desired, and he wanted him to have everything that was possible for him to be able to do . . . what he wanted to do." She further testified that Laterra had communicated that he intended to take care of Michael financially. In years previous to his death, Laterra had paid medical bills and other things in addition to child support.

Laterra's mother, Bonnie Laterra, testifying as to the nature of the ownership of the properties, stated that the properties were held in joint tenancy so that "if one of us went, the other one could take over and carry on."

The trial court allowed this testimony as an exception to the hearsay rule, finding that the statements reflected Laterra's then-existing state of mind.

Treaster objected to this entire line of testimony as being inadmissible hearsay. We note, before we address the issue, that some of the testimony to which Treaster objected was based upon personal observations of Laterra and his prior conduct in buying and fixing up property and were not statements made by him.

Michael argues that the above testimony, if it is hearsay, is nonetheless admissible as an exception to the hearsay rule. K.S.A. 1991 Supp. 60-460(l) provides: "Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotional or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health" is admissible. Here, there is no suggestion that such statements were made in bad faith.

The scope of K.S.A. 1991 Supp. 60-460(l)(1) is somewhat limited. "It is concerned only with a declaration of a presently existing subjective condition, that is, a specified mental or physical condition existing at the time of the utterance, which necessarily

includes an element of *res gestae*, if not true spontaneity." *Thompson v. Norman*, 198 Kan. 436, 444, 424 P.2d 593 (1967). See 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(1) (1979).

In *State v. Hobson*, 234 Kan. 133, 156, 671 P.2d 1365 (1983), the court held that certain statements made by a criminal defendant were admissible under K.S.A. 1982 Supp. 60-460(l).

"It is clear under K.S.A. 1982 Supp. 60-460(l) spontaneous statements made by a defendant prior to the commission of a crime are admissible to show intent, plan, motive, design, malice or ill will where the defendant's state of mind is an issue in the case or is relevant to prove or explain acts or conduct of the defendant."

Hobson's statements reflected her ill feelings toward the victim and were, therefore, probative of intent and motive at the time of the victim's death.

Case law from other jurisdictions indicates that statements similar to those found here are admissible to show the then-existing state of mind of the declarant. See *D'Angelo v. United States*, 456 F. Supp. 127, 130 (D. Del. 1978); *Bassett v. Burlington No. R.R. Co.*, 131 Ill. App. 3d 807, 815, 476 N.E.2d 31 (1985).

In *Morrison v. Bradley*, 655 P.2d 385 (Colo. 1982), we find a case directly on point. In *Morrison*, a son and daughter brought a wrongful death action against an individual who had shot and killed their father. The jury found in favor of the son and daughter. On appeal, the defendant argued that the trial court erred in allowing the son to testify, over objection, that his father had promised to pay for post high school training as a heavy equipment operator and also promised to help pay for a 1978 truck for him. The court found that this testimony was hearsay, but determined that "[t]he statements admitted in this case were indicative of the father's then existing state of mind to assist his son . . . [and] were made for no ulterior purpose which would encourage fabrication." 655 P.2d at 387. Although the court decided the case under Colorado common law, it noted that the statutory exception followed the common-law definition of the state of mind exception.

There is nothing in the record to indicate that Laterra's statements were anything other than trustworthy, sincere expressions of his plans and hopes for Michael. The statements were expressions of Laterra's then-existing state of mind regarding his

intent and plans for his son's future. We find the trial court properly admitted these statements.

## STRICT LIABILITY DIRECTED VERDICT

At the close of Michael's case, his counsel moved for a directed verdict on the issue of liability. The trial court granted this motion on the theory of strict liability, finding that the manner in which Steere took her life was an inherently dangerous activity. This ruling resolved the issue of liability in Michael's favor, and the jury considered only the issue of damages.

Simply stated, the issue here is whether, under the unique facts of this case, the method of committing suicide was such an inherently and abnormally dangerous activity so as to require a court to direct a verdict on the theory of strict liability.

In *Williams v. Amoco Production Co.*, 241 Kan. 102, 114, 734 P.2d 1113 (1987), the Kansas Supreme Court adopted Sections 519 and 520 of the Restatement (Second) of Torts (1976) to determine strict liability in tort for abnormally dangerous activities. The general rule is as follows:

"(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

"(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts § 519 (1976).

Section 520 of the Restatement sets out the following test for determining whether an activity is abnormally dangerous:

"In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes."

"Whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors

listed in this Section, and the weight given to each that it merits upon the facts in evidence." Restatement (Second) of Torts § 520, Comment.

Treaster argues that the concept of strict liability found in Sections 519 and 520 of the Restatement has no applicability to Steere's activity. Treaster claims that this concept applies to an actor who is consciously aware of the risk of harm of his or her activity to the public, is unable to change his or her operations to remove the risk of harm, and chooses to continue his or her "business" because of its value to the community. Michael argues that Steere's actions come under the umbrella of strict liability as defined by the Restatement.

Treaster admits that Steere's actions were dangerous and hazardous, but argues that this does not necessarily mean the activity is abnormally dangerous for purposes of tort liability. In Kansas, several cases have addressed the abnormally dangerous activities issue. In *Falls v. Scott*, 249 Kan. 54, 62, 815 P.2d 1104 (1991), the Kansas Supreme Court ruled that the trial court erred in ruling that the operation of a brush hog mowing machine was *not* an inherently dangerous activity and that, based upon the facts of the case, the question should have been submitted to the jury. In *Williams v. Amoco Production Co.*, 241 Kan. at 116, the Supreme Court held that drilling and operating natural gas wells were not abnormally dangerous activities or non-natural uses of land. Similarly, in *Arnold Associates, Inc. v. City of Wichita*, 5 Kan. App. 2d 301, 317, 615 P.2d 814 (1980), *rev. denied* 229 Kan. 669 (1981), this court held that the city's maintenance of water main was not an abnormally dangerous activity under the facts of the case.

Treaster cites *Goodwin v. Reilley*, 176 Cal. App. 3d 86, 221 Cal. Rptr. 374 (1985), in support of his position that Steere's actions in committing suicide were not an abnormally dangerous activity. In *Goodwin*, parents sued a motorcyclist for negligent infliction of emotional distress resulting from injuries suffered by their son which were caused by defendant's driving while intoxicated. The parents argued defendant was strictly liable because driving under the influence of alcohol was an ultrahazardous activity within the scope of Restatement (Second) of Torts § 519.

The court disagreed with the parents' argument to impose strict liability. The court held that, although the act of driving a motor vehicle under the influence of alcohol is unquestionably dangerous and hazardous-in-fact, this activity did not come within the rubric of an abnormally dangerous activity for purposes of imposing strict liability.

Comment (f) to Restatement (Second) of Torts § 520 defines "abnormally dangerous" as follows:

"For an activity to be abnormally dangerous, not only must it create a danger of physical harm to others but the danger must be an abnormal one. In general, abnormal dangers arise from activities that are in themselves unusual, or from unusual risks created by more usual activities under particular circumstances. In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily. Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care. In other words, are its dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence."

In our view, Steere's use of her automobile to commit suicide was abnormal, creating an unusual risk because of the circumstances surrounding her suicide. No amount of reasonable care could have prevented carbon monoxide from escaping her garage and entering the remainder of the duplex. The activity was definitely not a matter of common usage and was inappropriate to the place where it was carried on. Steere's suicide had absolutely no value to the community and was, thus, greatly outweighed by its dangerous attributes. On its face, Steere's suicide fits the definition of an abnormally dangerous activity.

The standard of review of a motion for a directed verdict is well settled.

"In ruling on a motion for a directed verdict, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence

in favor of the party against whom the ruling is sought, and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. [Citation omitted.]

"The standard of appellate review of a motion for directed verdict is the same as that for the trial court. [Citation omitted.]" *Falls v. Scott*, 249 Kan. at 63-64.

Treaster argues that strict liability in tort is intended to apply to defendants who are aware of the risk of danger and yet choose to carry on the hazardous activity. Admittedly, there is no evidence that Steere was aware of any risk except to herself. However, the Restatement (Second) of Torts § 520 does not include knowledge of the risk as a factor to consider in determining whether an activity is abnormally dangerous. Treaster would have us graft on this requirement to the Restatement and apply it to Kansas law. This we cannot do.

The Restatement instructs courts to consider the facts in evidence in determining the weight each factor in § 520 should be given. Treaster argues that the question of whether the suicide was abnormally dangerous should have gone to the jury.

In the cases cited by Treaster, particularly *Falls v. Scott*, there was conflicting evidence regarding the safety of the mower and whether the operator was aware of the risk. There is no such conflicting evidence regarding the safety of Steere's suicidal activity. The evidence at trial revealed that the fumes were so thick within the duplex when the police arrived that "it took several minutes to ventilate the house before the employees could enter in and start our investigation."

Finally, Treaster claims the trial court erred in failing to find that the harm suffered in this case is the type of harm that makes the activity abnormally dangerous pursuant to the Restatement (Second) of Torts § 519(2). Treaster argues that, during oral argument on the motion for directed verdict, Michael's counsel admitted that this issue should go to the jury.

Our reading of the record leads us to conclude that, taken as a whole, Michael's counsel stated that, if this was the only remaining issue, there is no need to give it to a jury because there was no doubt that Laterra's death was precisely the type of harm that made Steere's activity inherently dangerous. The Restatement (Second) of Torts § 519(2) does not require the judge to

make an express finding on the record that the harm which resulted from the abnormal activity was the type of harm which makes the activity dangerous. Such a finding is inherent here in the trial court's ruling. The court clearly stated the jury could not possibly come to any other result with respect to liability. Treaster's argument on this issue is without merit.

## INSTRUCTION CONCERNING FUTURE DAMAGES

The trial court instructed the jury, in part, as follows:

"The following damages may be allowed:
(1) Pecuniary loss. This type of damage includes:
(a) Services; attention; parental care; advice; protection; educational training and guidance; and physical training and guidance.
(b) Loss of financial support that you find that Steven Ray Laterra would have provided to the plaintiff during his expected lifetime.
(c) Expenses for the deceased's funeral.
"For items (1)(a) and (b), you should allow an amount which you believe to be a fair and reasonable monetary equivalent to the benefits plaintiff could reasonably have expected to receive from the continued life of the deceased."

Treaster objected to paragraph (1)(b) of the instruction, complaining that it allowed the jury to award damages for loss of future financial support that Laterra would have provided to Michael during Laterra's expected lifetime. Treaster sought to limit the award of damages for financial support to the remaining period of Michael's minority status.

The basis for the instruction given was PIK Civ. 2d 9.31 (1992 Supp.). The PIK instruction includes, as an element of pecuniary damages for the wrongful death of a parent, the "[l]oss of financial support which you [the jury] find the deceased would have provided during the plaintiff's minority." During the instruction conference, the trial court approved a change in the language of the instruction to allow the jury to consider the loss of support Laterra would have provided Michael during Michael's expected lifetime, not just during his minority.

The trial court stated:

"The Court's view is that the evidence supported a conclusion that the plaintiff minor might well expect benefit from his father had he lived even after the time of minority and, therefore, notwithstanding the limitation in PIK, the Court feels that the instruction as given was proper with respect to deleting that limitation."

Kansas law is clear that a parent has no legal duty to support a child beyond the age of majority, unless that child is physically or mentally unable to maintain and support himself or herself.

Michael argues that damages in a wrongful death case are based upon reasonable expectations of future financial contribution rather than legal entitlement. Michael contends that neither Kansas' wrongful death statute nor Kansas case law limits the damages recoverable by a child for lost financial contributions of a parent to the period of the child's minority. We agree.

K.S.A. 1991 Supp. 60-1903 and K.S.A. 1991 Supp. 60-1904 contain no limitation of a child's recovery. K.S.A. 1991 Supp. 60-1904 provides that "[d]amages may be recovered for . . . loss of parental care, training, guidance or education." K.S.A. 1991 Supp. 60-1903(a) provides: "In any wrongful death action, the court or jury may award such damages as are found to be fair and just under all the facts and circumstances."

Our Supreme Court, in *McCart v. Muir*, 230 Kan. 618, 626, 641 P.2d 384 (1982), defined pecuniary loss as "a loss of money or of something by which money or something of money value may be acquired. [Citation omitted.] Pecuniary loss or damages in a wrongful death case should be equivalent to those pecuniary benefits or compensation that reasonably could have been expected to have resulted from the continued life of the deceased."

Other PIK Civ. 2d instructions are consistent with *McCart*. PIK Civ. 2d 9.32 (1992 Supp.) allows a parent to recover as pecuniary damages the "[l]oss of financial support which you [the jury] find the deceased [child] would have contributed to the parents during the remainder of their expected lifetimes." The right of a parent to recover damages for the death of a child even beyond the child's majority dates back to *Railroad Co. v. Cross*, 58 Kan. 424, 49 Pac. 599 (1897). In *Cross*, parents brought suit against a railroad company for the wrongful death of their son. The court held that the jury was not necessarily restricted to an allowance of the value of the son's services during minority, but could take into account pecuniary benefits which the parents may reasonably be expected to receive from him after he reached his majority. 58 Kan. at 428.

PIK Civ. 2d 9.33 (1992 Supp.) allows surviving siblings, grandparents, and other parties to recover damages in a wrongful death action. Again, a plaintiff may recover for the "[l]oss of financial support which you find the deceased would have contributed to the plaintiff(s) during the remainder of . . . their expected lifetimes." PIK Civ. 2d 9.33 (1992 Supp.). There appears to be no valid reason why a child should be limited to loss of financial support a deceased parent would have provided during the child's minority, rather than the support the child could have reasonably expected to receive during his entire lifetime. It is patently unfair to base a child's recovery for the loss of a parent solely on legal entitlement when age or status are not even considerations for other classes of plaintiffs.

In *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 505, 701 P.2d 939 (1985), our Supreme Court provided the text for the jury instructions used at trial, one of which allowed the minor children to recover as pecuniary damages the "[l]oss of financial support which you [the jury] find the deceased would have provided," with no limitation as to minority. Admittedly, a child's ability to recover past his minority was not an issue in *Wentling*.

We can find no basis for stating as a rule of law, under the facts as we find them here and our examination of the statutes, PIK instructions, and case law, that a child should be limited to the loss of financial support a deceased parent would have provided during the child's minority rather than the support the child could reasonably have expected to receive during the child's entire lifetime.

We conclude the trial court's modification of the PIK instruction here accurately reflected Kansas law.

## FUTURE DAMAGES INSTRUCTION

Finally, Treaster argues that the trial court erred by refusing to instruct the jury that all awards for future damages should be reduced to present value.

At trial, Treaster offered no tables or formulae into evidence for the jury to consider, and his proffered instruction on present value provided no guidance to the jury on how to properly reduce the amount of its damage award to present value. While Kansas law states that a defendant is entitled to have any amounts

awarded for future damages reduced to present value, the defendant has the burden of proof to give the court and the jury the tools to establish the economic variables of interest rates and inflation. Here, Treaster failed to present any foundation evidence on any economic figure for the jury to consider during deliberations.

Treaster did present the testimony of an expert, a professor of finance, who was allowed, over Michael's objection, to illustrate the principle of present value to the jury. However, the expert's testimony was limited by the court to merely providing an illustration of the concept of present value to the jury through the use of a hypothetical situation. The limited economic facts in the record might have confused and misled the jury had this instruction been given without further details on the proper method of calculation.

"It is the duty of the trial court to properly instruct the jury upon the theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. . . . A party is entitled to an instruction explaining its theory of the case where there is evidence to support it." *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991).

In a recent Kansas case, *Gregory v. Carey*, 246 Kan. 504, 791 P.2d 1329 (1990), the Supreme Court prevented the defendants in a medical malpractice action from presenting evidence concerning an annuity insurance contract to pay the future medical expenses of the plaintiff. The court refused to allow the testimony because it compromised the plaintiff's right to a jury trial on damages and it was speculative and also because of inherent hearsay problems. The Supreme Court upheld the trial court's ruling on hearsay grounds, finding that the expert's testimony was not based on personal knowledge or within the expert's field of expertise. 246 Kan. at 508.

In *Gannaway v. Missouri-Kansas-Texas Rld. Co.*, 2 Kan. App. 2d 81, 575 P.2d 566 (1978), the trial court gave the jury a detailed instruction on reducing future damages to present value. After court and counsel had settled on the instructions, the defendant asked the court to give the jury tables or mathematical formulae for reducing lost future earnings to present worth, as the court's instruction required the jury to do. The court refused to do so,

and, on appeal, this court agreed with the trial court, stating the trial court was correct in rejecting the exhibits, "particularly considering the time they were offered." 2 Kan. App. 2d at 82. Additionally, this court found that the defendant had failed to comply with the foundation requirements of K.S.A. 60-409(c). Here, Treaster offered no formulae, tables, or any aids for the jury.

We conclude the trial court did not err by refusing to give the instruction on present value where Treaster failed to present proper foundation evidence or any guidance for the jury.

Affirmed.