(252 P.3d 128)

No. 103,728

HARRIET F. EGGESON, *Appellee*, v. GERTRUDE DELUCA, *Appellant*.

Opinion filed February 25, 2011.

*M. Courtney Koger, John M. McFarland,* and *Scott E. Harvison*, of Kutak Rock LLP, of Kansas City, Missouri, for appellant.

*John P. Hastings*, of Leawood, for appellee.

Before GREENE, P.J., GREEN, J., and LARSON, S.J.

GREEN, J.: John and Barbara Leavey, husband and wife, executed joint contractual wills in 1987 which detailed their asset distribution plan for Barbara's siblings and John's children upon the death of the surviving spouse. After Barbara signed a durable power of attorney in 1997 allowing John to create a revocable trust with dispositive provisions "substantially similar" to her 1987 will, John created revocable trusts for both him and Barbara that contained virtually the same asset distribution plan to Barbara's siblings and John's children as their 1987 joint contractual wills. In

2002, approximately 3 years after Barbara's death, John executed an amendment to his trust that effectively changed the asset distribution plan. It greatly changed the asset distribution between Barbara's siblings and John's children.

Harriet Eggeson, Barbara's sister, filed the present declaratory action against Gertrude DeLuca, John's daughter and the trustee of John's trust, challenging John's 2002 amendment to the 1997 trust and asking for reformation of the trust. The trial court determined that John's 2002 amendment to the trust was not authorized by the 1987 joint contractual wills or by Barbara's durable power of attorney and granted summary judgment to Eggeson.

On appeal, DeLuca contends that the trial court improperly excluded statements made by John as to his reasons for executing the 2002 amendment and that a genuine issue of material fact existed as to whether the 2002 amendment resulted in an estate plan "substantially similar" to the 1987 joint contractual wills. Nevertheless, we determine that John's statements, which were made approximately 15 years after the 1987 wills were executed and approximately 3 years after Barbara's death, constituted inadmissible hearsay and were not relevant to the issues in this case. Moreover, no genuine issue of material fact existed as to whether John's 2002 amendment resulted in an estate plan "substantially similar" to the 1987 joint contractual wills. Because John's 2002 amendment completely changed the asset distribution plan in the 1987 joint contractual wills and was contrary to John's and Barbara's agreement regarding the distribution of their assets, we determine that the trial court properly granted summary judgment to Eggeson. Accordingly, we affirm in part and remand with instructions.

John and Barbara Leavey were married in 1975. In June 1975, before they were married, John and Barbara executed an antenuptial agreement in which they stated that they "both have relatives for whom they desire to preserve their respective estates." Within the antenuptial agreement, John and Barbara agreed that all of the real and personal property owned by each party when the marriage occurred would remain the separate property of the respective party. In addition, the antenuptial agreement created a life estate for John in Barbara's residence at Lake Quivira:

"In view of the fact that [John]'s residence is being sold in anticipation of the marriage, and that it may be his desire to continue his residence in the home of [Barbara] after her death, it is agreed that [John] shall be allowed to live in the residence of [Barbara] for so long as he desires, should [Barbara] die, and this agreement shall act as the creation of such an estate in the residence."

Attached to the antenuptial agreement were balance sheets listing John's net assets at $113,620, including his residence which was to be sold, and Barbara's net assets at $220,700, including the Lake Quivira house.

In February 1987, Barbara and John executed joint reciprocal wills. Both Barbara's and John's wills recited the fact that the parties intended to create joint wills: "The two Instruments are intended to be, and shall be construed as Joint Wills. Neither of us may modify or revoke our Will during, or after the lifetime of the other, unless consented to by the non-modifying or non-revoking spouse."

Within Article VII of her will, Barbara again gave John a life estate in her real property at Lake Quivira. Barbara's will further provided that upon John's death, the Lake Quivira property would pass to Barbara's siblings as follows:

"Upon my husband's death the said real property shall pass to my brother and sister, John O. Farmer and Harriet F. Eggeson, absolutely and in fee simple, share and share alike. If any such brother or sister of mine predeceases me, his or her share shall be distributed to that brother or sister that does survive me."

Under Article VI of her will, Barbara gave all of her personal property and the entire residue of her estate to John. Similarly, under Article VI of his will, John gave Barbara the entire residue of his estate, "whether real personal or mixed of every kind, nature and description whatsoever." Both Barbara's and John's wills provided that the surviving spouse was to give certain monetary gifts to three charitable organizations. Moreover, the surviving spouse was to devise the residue of the surviving spouse's estate as follows: one-half of the personal property and all of the real property to Barbara's brother and sister, John O. Farmer and Harriet F. Eggeson, and one-half of the personal property to John's children, Gertrude C. DeLuca and Robert F. Leavey.

In April 1997, Barbara Leavey executed a durable power of attorney appointing John Leavey her "true and lawful Attorney in Fact." Under Barbara's durable power of attorney, John was granted the power to do the following:

"(21) To transfer all or any part of my assets to any revocable trust of which I am the grantor;

"(22) To establish a revocable trust on my behalf with dispositive provisions substantially similar to those of the Last Will and Testament executed by me prior thereto."

In May 1997, John established revocable trusts for both him and Barbara. John signed Barbara's trust as "Barbara M. Leavey by John F. Leavey." John was the trustee of both his and Barbara's trusts. Both Barbara's and John's trust documents created the Family Trust, which "shall be funded with the largest amount of assets, if any, which, if allocated to the Family Trust, would result in no increase in federal estate tax payable at Grantor's death."

Article III of both trusts provided that upon the death of the other spouse, the assets of the Family Trust were to be managed and distributed as follows:

"B.    Provisions Applicable After Death of Grantor's Spouse

1.    Distribution of Residence. Trustee shall distribute Grantor's residence at Lake Quivira, Kansas, to the extent said residence comprises a portion of the trust estate, equally to the siblings of Grantor's spouse, HARRIET EGGESON and JOHN O. FARMER, outright and free of trust, if they are then living. If either HARRIET EGGESON or JOHN O. FARMER predeceases Grantor, the Trustee shall distribute Grantor's residence to the survivor. If both HARRIET EGGESON and JOHN O. FARMER both predecease Grantor, then this gift shall lapse.

2.    Division of Assets Into Shares. Upon the death of Grantor's spouse, or upon the death of Grantor, if Grantor's spouse does not survive Grantor, Trustee shall divide the principal of the Family Trust, as then constituted, as follows:

a.    Distributions to Children. Trustee shall pay over and distribute, outright and free of trust, one-half (½) of the remaining trust assets equally to Grantor's children, GERTRUDE C. DeLUCA and ROBERT F. LEAVEY, if they are then living. . . .

b.    Distributions to Siblings of Grantor's Spouse. Trustee shall pay over and distribute, outright and free of trust, one-half (½) of the remaining trust assets equally to the siblings of Grantor's spouse, JOHN O. FARMER and HARRIET EGGESON, if they are then living. . . ."

Under Article XX of both trust documents, the Grantor reserved the right to alter, amend, and revoke the trust agreement.

After Barbara's death in 1999, John amended his 1997 trust agreement. Specifically, in October 2002, John executed a first amendment to his trust agreement, which provided as follows:

"Paragraph B of Article III shall be deleted in its entirety, and the following new paragraph B of Article III shall be substituted therefor:

"B.   Provisions Applicable After Death of Grantor. Upon the death of Grantor, the Trustee shall distribute the remaining trust assets equally to Grantor's children, GERTRUDE C. DeLUCA and ROBERT F. LEAVEY, if they are then living. If either GERTRUDE C. DeLUCA and ROBERT F. LEAVEY predeceases Grantor, then his or her share shall be distributed to his or her then living descendants, *per stirpes*."

Thus, under the 2002 amendment, all of the remaining trust assets were to be distributed to John's children.

Apparently, John continued to live in the Lake Quivira home until he died in 2006. Around July 2006, Eggeson sold the Lake Quivira home for approximately $575,000. John's children did not receive any of the proceeds from the sale of the Lake Quivira home. After John's death, the residue of John's trust was held on account with Merrill Lynch. In September 2006, the approximate value of the residue of John's trust was $700,000.

After John's death, Eggeson petitioned for the probate of a will and the issuance of letters testamentary in regard to John's 1987 will. Nevertheless, the trial court denied admission of John's 1987 will to probate. The trial court determined that the evidence failed to establish that John's 1987 will was executed with the statutory formalities of execution required under K.S.A. 59-606. The trial court held that Eggeson had failed to show that John's 1987 will was attested to and subscribed in John's presence by at least two competent witnesses who saw him subscribe or heard him acknowledge the will. This court affirmed the trial court's decision. See *In re Estate of Leavey*, 41 Kan. App. 2d 423, 424-26, 202 P.3d 99 (2009).

In October 2006, Eggeson also filed the present declaratory judgment action against DeLuca. Eggeson sought a declaratory judgment from the trial court declaring that Barbara's and John's

1987 wills were joint contractual wills that were enforceable and binding upon Barbara's and John's heirs, successors, and assigns. In addition, Eggeson sought a judgment declaring that the trusts created by John under his durable power of attorney were not in conformity with the 1987 contractual wills and that the trusts were subject to reformation by the trial court. Further, Eggeson brought claims of conversion and failure to perform duties as the successor trustee to Barbara's and John's trusts against DeLuca.

In June 2009, Eggeson moved for summary judgment. DeLuca then moved to strike Eggeson's motion for summary judgment and supporting brief for failure to comply with the requirements of Supreme Court Rule 141 (2010 Kan. Ct. R. Annot. 228). Approximately 1 month after DeLuca's motion to strike was filed, Eggeson filed an amended brief supporting her motion for summary judgment.

In responding to Eggeson's amended brief, DeLuca set forth additional facts from an affidavit filed by her and an affidavit filed by Cheryl Boushka, the attorney retained by John to draft the 2002 amendment. In their affidavits, both DeLuca and Boushka detailed statements made by John that because the Lake Quivira property had greatly increased in value, he had executed the 2002 amendment in order to more evenly distribute estate asset values among DeLuca, Robert Leavey, Eggeson, and Farmer.

In a detailed written memorandum decision filed in December 2009, the trial court granted summary judgment to Eggeson. The trial court found no prejudice to either party "from the shortcoming or omissions of the other to strictly observe the requirements of Rule 141" and deemed Eggeson's motion for summary judgment properly submitted for ruling. Moreover, the trial court determined that the proffered testimony of John, as contained in DeLuca's and Boushka's affidavits, was inadmissible hearsay. In addition, the trial court held that John's rationale or motive for amending his 1997 trust to disinherit Eggeson and Farmer from receiving one-half of the residuary assets in the Family Trust was not relevant or admissible evidence at trial.

The trial court determined that John's authority to modify or revoke the dispositive provisions of his and Barbara's 1987 wills

and 1997 trusts was limited and that he could not change his and Barbara's dispositive estate plan without Barbara's consent. Concluding that John's 2002 amendment to the trust agreement must be reformed to be consistent with Barbara's expectations for distribution of their estates, the trial court stated as follows:

"The Court concludes, as a matter of law, that the [Durable Power of Attorney] did not give Mr. Leavey the power to amend his revocable trust more than three years after Mrs. Leavey's death in a manner contrary to her justified expectations as expressed in their 1975 Antenuptial Agreement, their 1987 Wills, her 1997 [Durable Power of Attorney], and their 1997 Revocable Trusts. Reading and considering these documents *in pari materia*, Mr. Leavey's 2002 Amendment of his Family Trust must be reformed to be consistent with Mrs. Leavey's expectations for distribution of their estates."

Thus, the trial court held that Eggeson and Farmer should share the residue of the estate equally with DeLuca and Robert Leavey.

### Did the Trial Court Err in Granting Summary Judgment to Eggeson?

On appeal, DeLuca argues that the trial court erred in granting summary judgment to Eggeson when material issues of fact remained as to John's intent in 2002 when he amended his revocable trust and whether the 2002 amendment resulted in a "substantially similar" distribution of his and Barbara's estate.

### Standards of Review

This court's standard of review in summary judgment cases is well established. When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must

be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Shamberg, Johnson, & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

Moreover, DeLuca's argument requires the interpretation of the various written instruments involved in this case. The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009). Regardless of the trial court's construction of a written instrument, an appellate court may construe a written instrument and determine its legal effect. See *Shamberg*, 289 Kan. at 900. The question of whether a written instrument is ambiguous presents a question of law subject to de novo review. *City of Arkansas City v. Bruton*, 284 Kan. 815, 829, 166 P.3d 992 (2007).

*Barbara's and John's 1987 Wills Constituted Joint Contractual Wills.*

In granting summary judgment to Eggeson, the trial court in this case determined that the terms of Barbara's and John's wills were enforceable by contract. DeLuca does not dispute this determination. Moreover, DeLuca apparently concedes that the 1987 wills formed a contract between John and Barbara.

"Mutual wills made in pursuance of a contract and in consideration of reciprocal provisions do not violate public policy and have long been held valid in Kansas. [Citation omitted.]" *In re Estate of Stratmann*, 248 Kan. 197, 203, 806 P.2d 459 (1991). Whether a will is contractual presents a question of fact. *In re Estate of Chronister*, 203 Kan. 366, 372, 454 P.2d 438 (1969). The burden is on the party who asserts a contract to establish by direct or circumstantial evidence that mutual and contractual wills were made in consideration of each other. The contract must be established by full and satisfactory proof that cannot be supplied by a presumption arising from the fact that the wills were mutual. The fact that the wills fail to reference a contract is not conclusive. Moreover, a contract cannot be presumed because two people simultaneously make reciprocal testamentary dispositions. *Stratmann*, 248 Kan. at 203-04. Nevertheless, the terms of the will may

be circumstantial evidence of a contract and may show by impli-
cation, along with other known circumstances such as family rela-
tions, that execution of the will was the result of a preexisting agree-
ment. Finally, the contract must be definite, certain, and
unequivocal as to parties, subject matter, and consideration. *Reznik
v. McKee, Trustee*, 216 Kan. 659, 674, 678, 534 P.2d 243 (1975).

The following seven factors generally indicate the testators' in-
tent to be contractually bound by a joint and contractual will:

" ' "(1) A provision in the will for a distribution of property on the death of the
survivor;

" ' "(2) a carefully drawn provision for the disposition of any share in case of a
lapsed residuary bequest;

" ' "(3) the use of plural pronouns;

" ' "(4) joinder and consent language;

" ' "(5) the identical distribution of property upon the death of the survivor;

" ' "(6) joint revocation of former wills; and

" ' "(7) consideration, such as mutual promises." [Citations omitted.]' " *Mangels
v. Cornell*, 40 Kan. App. 2d 110, 116, 189 P.3d 573 (2008).

See *Reznik*, 216 Kan. at 674-78; *In re Estate of Thompson*, 206
Kan. 288, 291, 478 P.2d 174 (1970); *In re Estate of Chronister*, 203
Kan. at 369-71; *In re Estate of Wade*, 202 Kan. 380, 390, 449 P.2d
488 (1969).

An application of the previous seven factors to Barbara's and
John's 1987 wills supports the trial court's conclusion that the wills
were contractual in nature. The 1987 wills provide for the distri-
bution of property upon the death of the surviving spouse. The
wills further provide for the distribution of property in the event
that one of Barbara's siblings or John's children predeceases the
surviving spouse. Although the use of plural pronouns is not pres-
ent throughout the 1987 wills, the following joinder language con-
tained in both wills expresses a clear intent by Barbara and John
that the wills were joint and contractual:

"My [spouse and] I are executing a Last Will and Testament at approximately the
same time. The two [1987 wills] are intended to be, and shall be construed as
Joint Wills. Neither of us may modify or revoke our Will during, or after the
lifetime of the other, unless consented to by the non-modifying or non-revoking
spouse."

Moreover, in their 1987 wills, both Barbara and John revoked all previous wills and codicils and provided for the identical distribution of property upon the death of the surviving spouse. Based on those provisions in Barbara's and John's 1987 wills, the trial court properly determined that the intent of Barbara and John was to create joint and contractual wills.

Importantly, although John's 1987 will was not accepted for probate, it still formed an enforceable contract between John and Barbara. Our Supreme Court has held that a single written instrument may be both a will contractual in nature and a contract testamentary in character. As a will, it is revocable. As a contract, however, it is enforceable. Thus, although a contractual will revoked by execution of a second will cannot be probated, it may still be enforced as a contract against the estate of the testator breaching it. *Reznik*, 216 Kan. at 671. Similarly, although John's 1987 will did not meet all of the testamentary formalities to be accepted for probate, it could still be enforced as a contract against his estate. As set forth in *In re Estate of Burcham*, 248 Kan. 897, Syl. ¶ 1, 811 P.2d 1208 (1991), "[a] joint, mutual, and contractual will between husband and wife creates a binding, enforceable obligation upon the survivor who takes under the will to distribute the survivor's estate in accordance with the terms of the contractual will."

*Barbara's Durable Power of Attorney Allowed John to Execute a Trust with Dispositive Provisions "Substantially Similar" to Barbara's 1987 Will.*

The main dispute in this case centers around the language incorporated in Barbara's durable power of attorney. Approximately 10 years after John and Barbara executed their joint and contractual wills, Barbara signed a durable power of attorney allowing John to establish a revocable trust with dispositive provisions "substantially similar" to those of her prior will and to transfer all or any part of her assets to such revocable trust.

Neither party argues that the 1997 trust agreements failed to meet the "substantially similar" requirement in Barbara's durable power of attorney. Rather, the dispute in this case is whether John's 2002 amendment to his 1997 trust comported with this "substan-

tially similar" requirement. In other words, did John's 2002 amendment result in provisions relating to the distribution of estate assets that were "substantially similar" to those contained in his and Barbara's 1987 contractual wills?

Eggeson maintains that the "substantially similar" language in Barbara's durable power of attorney did not allow John to completely disinherit Eggeson and Farmer from their one-half share of the residuary assets of the Family Trust. On the other hand, DeLuca contends that the "substantially similar" language allowed John to more evenly distribute the property in the Family Trust among Eggeson, Farmer, DeLuca, and Robert Leavey, based on the property's value.

*Were John's Statements Admissible to Clarify the "Substantially Similar" Requirement?*

DeLuca's main focus in her appellate and reply briefs is that John's statements; which were contained in her and Boushka's affidavits, created a genuine issue of material fact as to whether the 2002 amendment resulted in a "substantially similar" distribution of estate assets as that contained in the 1987 wills.

In making this argument, DeLuca focuses on the following statements contained in her affidavit:

"8. In or around October 2002, my father indicated to me that the value of the Lake Quivira Home had appreciated significantly over recent years. He told me that neighbors and other members of the community had discussed that home values had gone up and that lake homes were selling for a lot of money. My father also indicated to me that since his Lake Quivira Home was situated on multiple lots and was first-tier (sits directly on the Lake) it was particularly valuable in a lake community. My father told me that, in his opinion, the Lake Quivira Home was worth between $500,000 and $750,000.

"9. My father also told me in or around October 2002 that he amended his Revocable Trust so that when he passed, the residue of his trust would pass to me and my brother, Robert Leavey, in order to more evenly distribute between me and my brother and Mrs. Leavey's siblings the [] assets from the estate plan of my father and Mrs. Leavey."

In addition, DeLuca points to the following statements from the affidavit of Boushka, the attorney who drafted the 2002 amendment for John:

"3.	After Mr. Leavey executed the First Amendment, he told me that the reason he executed the First Amendment was to bring more into alignment the disposition of assets upon his death between the siblings of his deceased wife, Barbara M. Leavey, and his two children.

"4.	Mr. Leavey told me that his deceased wife held in trust for the benefit of her siblings a home at Lake Quivira, which had recently increased greatly in value, and in order to bring the disposition of assets between Mrs. Leavey's siblings and his children back into a more even alignment, he wanted to leave the residuary of his trust to his children."

In refusing to consider the previous statements made by John, the trial court determined that John's statements constituted inadmissible hearsay and did not fit within any of the recognized hearsay exceptions. Moreover, the trial court found that John's rationale or motive for amending his 1997 trust to disinherit Eggeson and Farmer from receiving one-half of the residuary in the Family Trust was not relevant or admissible evidence at trial.

Under K.S.A. 60-460, "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible" unless it meets one of the recognized hearsay exceptions under that statute. If the statement offered does not fit within the definition of hearsay, the evidence is admissible provided that the other rules of evidence are satisfied. *In re Estate of Kasper,* 20 Kan. App. 2d 309, Syl. ¶ 7, 887 P.2d 702 (1994).

Nevertheless, DeLuca maintains that John's statements were admissible evidence because they were not offered to prove the truth of the matter asserted but instead were offered to prove John's state of mind and intent, showing that he intended to maintain a "substantial similarity" in the distribution of the trust assets, and because they were statements of his mental condition under K.S.A. 60-460(l). K.S.A. 60-460(l)(1) states that declarations of present state of mind are admissible as an exception to the hearsay rule:

"Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant . . . ."

This court has previously stated that the scope of K.S.A. 60-460(l)(1) is somewhat limited. K.S.A. 60-460(1) " 'is concerned only with a declaration of a presently existing subjective condition, that is, a specified mental or physical condition existing at the time of the utterance, which necessarily includes an element of res gestae, if not true spontaneity.' [Citation omitted.]" *Laterra v. Treaster*, 17 Kan. App. 2d 714, 719-20, 844 P.2d 724 (1992). See 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460( l ) (1979).

Contrary to DeLuca's contentions, it is apparent that the majority of John's statements were offered to prove the truth of the matter asserted, that is, that he wanted to equalize the distribution of assets between Barbara's siblings and his children. Apart from John's statement that the Lake Quivira property had increased significantly in value, his other statements regarding his reasons for executing the 2002 amendment to his 1997 trust were offered to prove the truth of the matter asserted. In other words, DeLuca wanted to show by John's statements the truth of what he had actually said, that is, that John was attempting to equalize the distribution in asset values to Barbara's siblings and his own children.

If John's statements are not being offered to prove that he was attempting to equalize the distribution in asset values to Barbara's siblings and his own children with the 2002 amendment to his 1997 trust, then what do John's statements prove? Moreover, merely saying that an out-of-court declaration is not offered to prove the truth of the matter asserted does not make it admissible. The non-hearsay purpose must be relevant to some issue in the case. Here, John's state of mind is not an issue in the case.

To assess the strength of DeLuca's argument, we turn our attention to the principal case she cites in support of her argument: *Kasper*, 20 Kan. App. 2d 309. In *Kasper*, this court rejected the argument that the deceased testator's statements regarding her animosity toward certain family members and her intention to disinherit those family members were inadmissible hearsay. This court held that the testator's statements were not offered to prove the truth of the matter asserted, that is, the terms of her will, but instead were offered to prove that she did not have the requisite intent to revoke her will. In addition, this court noted the possible

applicability of the mental condition hearsay exception under K.S.A. 60-460(l) to allow the admission of the testator's statements. 20 Kan. App. 2d at 318-20.

What is readily apparent in *Kasper* is that the offered statements were admissible because they were statements by the testator and were relevant to the ultimate issue in the case, that is, whether the testator had the requisite intent to revoke her will. In the present case, however, none of the state-of-mind declarations were from Barbara or related to her intention in invoking the "substantially similar" language in the durable power of attorney document. Moreover, none of the state-of-mind declarations were offered to prove that someone had repeatedly stated that he or she had made no will (*Baird v. Shaffer*, 101 Kan. 585, 168 Pac. 836 [1917]) or whether someone had revoked a will (*Churchill v. Dill*, 145 Kan. 306, 65 P.2d 337 [1937]).

As the trial court pointed out, John's rationale or motive for amending his 1997 trust to disinherit Eggeson and Farmer from receiving their one-half portion of the residuary in the Family Trust is not relevant to the issues in this case. John's state of mind when amending the 1997 trust does not relate to Barbara's intent in including the "substantially similar" language in her durable power of attorney or to Barbara's intent as to the distribution of the estate assets.

As a result, the trial court properly determined that John's statements were self-serving and inadmissible. The trial court's finding is supported by the case of *In re Estate of Langdon*, 165 Kan. 267, 195 P.2d 317 (1948). In *Langdon*, the husband made a claim against his wife's estate. He asserted that he was entitled to a half interest in certain securities listed solely in his wife's name. In support of his claim, the husband presented testimony of a disinterested witness. The wife admitted to the disinterested witness that she used her husband's salary to purchase the securities in question. The wife's executor, however, moved to admit contrary evidence indicating that the securities were acquired and paid for by the wife before her marriage to claimant. In determining that the wife's statements of prior ownership of the securities were self-serving and should be excluded from consideration, our Supreme

Court stated: "In the instant case the testimony stricken was not that of a disinterested witness designed to show the intent of Mrs. Langdon but it was the self-serving statement of a deceased, Mrs. Langdon, designed to prove title to the securities in controversy." 165 Kan. at 276. Here, John's state-of-mind declarations were designed to prove why he amended his 1997 trust. Nevertheless, the fact that John amended his 1997 trust to equalize the distribution in asset values to Barbara's siblings and his own children is not in issue. Instead, the issue is whether John's 2002 amendment to his 1997 trust breached his contract with Barbara.

John's self-serving statements, which were made approximately 15 years after the 1987 wills were executed and 3 years after Barbara died, were not relevant to the issues involved here and were properly excluded by the trial court. See 4 Gard & Casad's Kansas C. Civ. Proc., 4th Annot. § 60-460(l) (2003) (The state of mind hearsay exception under K.S.A. 60-460(l) necessarily includes an element of res gestae, if not true spontaneity.) See also *Thompson v. Norman*, 198 Kan. 436, 444, 424 P.2d 593 (1967) (declarant's state of mind 2 weeks after accident was immaterial to issues involved; statement was narration of past facts and was not admissible under K.S.A. 60-460[l]).

*Did John's 2002 Amendment to the 1997 Trust Meet the "Substantially Similar" Requirement?*

DeLuca further argues that the question of whether John's 2002 amendment met the "substantially similar" requirement of Barbara's durable power of attorney should not have been decided on summary judgment because it presented a question of fact for the factfinder.

In this case, however, the question of what constituted "substantially similar" is based entirely on undisputed evidence in the form of written instruments. Here, in looking at the 1987 joint and contractual wills, Barbara's and John's intent is clear that Barbara's siblings, Eggeson and Farmer, were to receive Barbara's Lake Quivira home once Barbara and John had died. Both Barbara and John agreed that if Barbara predeceased John, he would enjoy a life estate in the Lake Quivira home. Nevertheless, upon John's death,

the Lake Quivira home would pass free and outright to Eggeson and Farmer. Both Barbara and John agreed that the remainder of the estate would pass one-half to Eggeson and Farmer and one-half to DeLuca and Robert Leavey.

Importantly, no reference is made in the 1987 joint and contractual wills to the value of the Lake Quivira home or the amount of assets that would eventually pass to Barbara's siblings and John's children. If John and Barbara had intended to agree to an approximately equitable distribution of assets upon their deaths, they could have easily specified that the value of the Lake Quivira home was to be considered within the one-half share that passed to Barbara's siblings. Instead, John's and Barbara's intent was clear that Eggeson and Farmer were to receive the Lake Quivira home before their one-half share of the remaining estate assets was computed.

Barbara's and John's intent concerning the Lake Quivira home is reflected throughout the documents executed by John and Barbara before and during their marriage. Before their marriage, John and Barbara executed an antenuptial agreement in which they agreed that they "both have relatives for whom they desire to preserve their respective estates." Within the antenuptial agreement, Barbara and John agreed that John would be given a life estate in Barbara's Lake Quivira home.

Later, in the 1997 trust documents, John's and Barbara's clear intent was for Eggeson and Farmer to receive the Lake Quivira home and a one-half share of the remaining trust assets. As in the previous 1987 wills, there was no mention of the value of the Lake Quivira home. Under the terms of the trust agreement, the Lake Quivira home was not included as part of the value of the one-half share of the Family Trust assets to be received by Eggeson and Farmer.

DeLuca argues that a reasonable interpretation of the "substantially similar" language in Barbara's durable power of attorney was that Barbara intended to allow John to more evenly distribute the trust assets among his children and Barbara's siblings. Nevertheless, such power would allow John to completely change the character of the distribution of the estate assets and would not result

in an asset distribution plan that was "substantially similar" to the dispositive provisions of Barbara's 1987 will. As the trial court points out, Barbara's and John's assets were never equal or even close to being equal when they were married. The balance sheets attached to the antenuptial agreements showed that Barbara's assets, which included the Lake Quivira home, were nearly double John's assets.

There is nothing else in the record to show that the asset distribution plan was ever equitable or that Barbara, by executing her durable power of attorney, intended for the estate assets to be distributed in a more equitable manner. Rather, the 1997 trust documents, which were executed approximately a month after Barbara executed her durable power of attorney, showed that the asset distribution plan to Barbara's siblings and John's children was virtually in line with the 1987 joint and contractual wills. The only notable change between the 1987 joint and contractual wills and the 1997 trust documents was that the relatively small monetary donations to the three charitable organizations were absent from the 1997 trust documents. Such change would fit within the "substantially similar" language of Barbara's durable power of attorney.

We find that John's 2002 amendment to his 1997 trust, which completely changed the asset distribution plan to Barbara's siblings and John's children and disinherited Barbara's siblings from their one-half share of the remaining trust assets, does not fit within the "substantially similar" language of Barbara's durable power of attorney. Although John had the authority to amend his trust, he breached his contract with Barbara when he did. As the result, the 2002 amendment is invalid and ineffective. Accordingly, we instruct the trial court to reinstate the language from Article III of the 1997 trust that set out the following distribution of trust assets: (1) the Lake Quivira property shall be distributed to Harriet Eggeson and John O. Farmer, outright and free of trust; and (2) the remaining trust assets shall be distributed one-half to Eggeson and Farmer and one-half to DeLuca and Robert Leavey.

Affirmed in part and remanded with instructions that the trial court is to reinstate the language from Article III of the 1997 trust

that set out the following distribution of trust assets: (1) the Lake Quivira property shall be distributed to Eggeson and Farmer, outright and free of trust; and (2) the remaining trust assets shall be distributed one-half to Eggeson and Farmer and one-half to DeLuca and Robert Leavey.