(887 P.2d 702)
No. 70,995

In the Matter of the Estate of MARY P. KASPER, deceased.

Opinion filed December 30, 1994.

*Michael S. Holland,* of Russell, for appellant Margaret A. Mahoney.

*Kenneth L. Cole,* of Woelk and Cole, of Russell, for appellees Louis L. Kasper and John L. Kasper, Sr.

Before BRAZIL, P.J., RULON and PIERRON, JJ.

PIERRON, J.: Margaret Mahoney appeals from an order admitting an executed copy of the will of Mary Kasper, deceased, to probate. Mahoney contends the trial court erred by concluding there was substantial competent evidence to rebut the common-law presumption that the will had been revoked. In addition, she argues the trial court erred by admitting into evidence prior statements made by the decedent.

On April 25, 1991, Mary Kasper executed a will drafted by her attorney, Kenneth Cole. When Mary left Mr. Cole's office, she was carrying both the original and a copy of her will. Louis Kasper, Mary's brother, drove her home and observed her as she placed both documents on her kitchen table.

Several months later, Louis saw both of the documents in a jar on Mary's kitchen table. The original and the copy of the will were in identical envelopes.

On February 9, 1992, Mary told Louis she did not want her will around the house. The following day, she gave Louis an envelope with instructions to deposit it into her safety deposit box at the Wilson State Bank. Mary told Louis, and he believed, that the envelope contained her will. Louis deposited the envelope marked "Legal Documents" into Mary's safety deposit box on February 10, 1992.

Mary died on March 20, 1993. Three days later, Louis and his son, John Kasper, went to Wilson State Bank to retrieve her will from the safety deposit box. At that time, they discovered the

envelope contained a copy of her will, rather than the original will. After searching Mary's house, they were unable to locate the original will. Louis does not know whether Mary intended to give him the copy or the original. No one knows what happened to Mary's original will. Consequently, on May 7, 1993, Louis and John filed a petition for probate of a lost will, pursuant to K.S.A. 59-2228.

On June 1, 1993, Mahoney filed written defenses to the petition for probate of a lost will and for letters testamentary. She objected to probating the lost will, alleging the copy submitted for probate was not the last will and testament of Mary Kasper. A hearing was scheduled, and the matter was tried to the court on November 19, 1993.

Mahoney sought to deny admittance of the copy of the will to probate by raising the common-law presumption that the will had been revoked. This presumption, which is recognized in Kansas is stated as follows:

"Where the facts disclose that a will, duly executed, was in the possession of the testator for some time immediately prior to his death and it cannot be found after his death, a rebuttable presumption arises that he did revoke the will or that he destroyed it with the intention of revoking it. *Churchill v. Dill*, 145 Kan. 306, 308, 65 P.2d 337 (1937); 79 Am. Jur. 2d, Wills § 606, p. 704." *In re Estate of Thompson*, 226 Kan. 437, 442, 601 P.2d 1105 (1979).

The parties stipulated that the will dated April 25, 1991, was signed by Mary and properly witnessed by two subscribing witnesses. In addition, the parties stipulated that Mr. Cole delivered the original and a copy of the will to Mary. Mahoney did not question whether the provisions of the April 25, 1991, will had been adequately established. Thus, the only issue addressed at the hearing was whether there was sufficient evidence to rebut the presumption that the will had been revoked.

Although Louis and John acknowledge they do not know what happened to the original will, they maintain Mary lost it. Louis, John, and Belinda Kasper (John's wife) each testified Mary had a habit of misplacing things. John, who had assisted Mary in her legal and financial affairs, testified that he frequently had to help Mary search various parts of her house to locate bank statements.

Likewise, Belinda testified "it would [*sic*] hide and go seek with papers in that house." On at least one occasion, Mary was seen placing documents in a trash can near her favorite chair when she was not sure who was walking into the room. However, Mary never asked Louis to look for her will or told him it was lost.

Mahoney contends the will could have been removed from the jar on Mary's kitchen table anytime after February 10, 1992, the date Louis deposited the copy with the Wilson State Bank. John testified that a week or two after February 10, 1992, the envelope, that had contained the original will, was no longer in the jar.

The facts surrounding the relationship between Mary and Mahoney's family shed light on Mary's intent regarding her will. After the death of Paul Kasper, Mary's brother, a family controversy arose between the Louis Kasper family (Louis, John, and Mary Vopat) and the Jim Kasper family (Mahoney, Jim Kasper, and Susan Kasper). Apparently, Paul had established a testamentary trust. For some reason, the Jim Kasper family was dissatisfied with the trust and forced its dissolution. Mary was deeply upset over the controversy. So much so, that in 1991 Mary revoked a prior will, executed in 1989, and replaced it with the will in question.

Under the terms of the 1991 will, Mary made a number of specific bequests to her nieces, nephew, great nieces, and her sister-in-law. Under the residuary clause, Mary left an undivided one-fourth interest to Vivian Zamrzla (niece); Mary Vopat (niece); Loretta Lowry (niece); and John Kasper (nephew). The members of the Jim Kasper family, who had caused Paul's trust to be dissolved, including Mahoney, received nothing under the terms of the 1991 will.

Louis would receive nothing if the will was admitted to probate, but if Mary's estate passed through intestacy, he would receive a one-third share. He testified that in the past, when Mary contemplated making changes to her will, she talked to him about those changes. Mary never expressed any regrets about changing her will in 1991. She never indicated to Louis she was going to revoke the 1991 will, nor did she ask him to retrieve or destroy the instrument in the safety deposit box.

John testified Mary was upset with Mahoney, Susan, and Jim. In January 1993, Mary was going into the hospital to have surgery. Around Christmas, two to four weeks prior to surgery, she discussed her affairs with John. Over counsel's objection, John testified regarding that conversation. According to John, Mary wanted to be sure that Mahoney, Jim, and Susan would receive nothing under the terms of her 1991 will. In addition, she wanted to be sure her great nieces received the specific bequests provided in her 1991 will.

Mary never expressed to John any regrets over the contents of her 1991 will. She entered the hospital on January 7, 1993. She spent a few days in a nursing home in Wilson and later died in the hospital. She never returned home. Thus, Mary only had access to her will for a few weeks following her conversation with John.

Vivian Zamrzla, Mary's niece, also testified Mary was upset with the members of the Jim Kasper family. On a number of occasions, including Thanksgiving 1993, Mary continued to express hostility toward them. She was further upset because Jim and his wife no longer came to visit her. Vivian also testified Mary never expressed any regrets regarding her will.

Mary Vopat, whom Mary depended on for her day-to-day maintenance, testified regarding the disdain Mary expressed toward the Jim Kasper family. Apparently, when Paul's trust was dissolved, Mary lost some income. Mary Vopat recalled one occasion when Mary did not have enough money for her prescriptions and said, "I don't have money for my prescriptions, well, I hope they're happy."

Mary Vopat visited Mary in the hospital several times. During one of those visits, Mary received flowers from Jim. Mary told Mrs. Vopat to remove the flowers from her room. On another occasion, Jim and his wife visited Mary in the nursing home. The visit upset Mary a great deal.

Belinda Kasper, also testified regarding the animosity that Mary expressed toward Mahoney, Jim, and Susan. Over objection, Belinda testified regarding a conversation between her and Mary in December 1992. Mary told Belinda the three members of the

Jim Kasper family would get nothing under her will. In addition, Mary said Belinda's children would be provided for in her will.

At the conclusion of the evidence, the trial court made the following findings of fact:

"On February the 10th, 1992, thirteen months before her death she directed her will be placed in a safety deposit box by her brother, Louis Kasper. She never expressed dissatisfaction with the terms of the 1991 will with any of the family confidants who testified in this hearing. It was known that she occasionally misplaced canceled checks and misplaced business papers in various parts or places in her house. She occasionally may have hidden papers. Her anger toward her brother Jim's children does not seem to have abated before her death. In November and December before her death she apparently confirmed certain provisions of the missing will regarding her grand nieces Theresa and Mary Elizabeth Kasper. Three weeks after her surgery and shortly before her death she directed flowers from Jim's family be removed from her hospital room. Shortly before her death she was apparently upset by a visit from Nephew Jim while in the nursing home rather than being happy to see him. The envelope containing the copy of the will bears an imposing caption of, quote, legal documents, closed quote, which is capable of misleading one concerning the contents."

Further, the court found "[t]he presumption that the testatrix intended to revoke the will has been rebutted by clear and convincing evidence and the will is deemed lost." The court ordered the copy of Mary's will admitted to probate pursuant to K.S.A. 59-2225. Mahoney appeals.

The first issue raised on appeal is whether there was sufficient evidence to rebut the common-law presumption that the will had been revoked. This court has recently had two occasions to address this issue: *In re Estate of Day*, 12 Kan. App. 2d 668, 753 P.2d 1296, *rev. denied* 243 Kan. 778 (1988); *In re Estate of Mattee*, 10 Kan. App. 2d 184, 694 P.2d 1325, *aff'd* 237 Kan. 652, 702 P.2d 1381 (1985).

In *In re Estate of Day*, 12 Kan. App. 2d at 668, Syl. ¶ 2, we found:

"If the presumption that the testator's intent to revoke is rebutted, the will is deemed lost, and a copy of the last will may be admitted to probate if the provisions of K.S.A. 59-2228 are satisfied. If the presumption is not overcome, probate of the will is denied on the basis of the inferred intent to revoke."

"Proving that a will is revoked and establishing a lost will are different issues." *In re Estate of Mettee*, 10 Kan. App. 2d at 187.

K.S.A. 59-2228 provides that "[a] lost or destroyed will may be established if its provisions are clearly and distinctly proved." Before the trial court, Mahoney did not question the proof regarding the provisions of Mary's will, nor does she raise that issue before this court. Nonetheless, we note an unchallenged copy of Mary's will was produced and is sufficient to clearly and distinctly prove the provisions of her will. See *Churchill v. Dill*, 145 Kan. at 308.

On appeal, "we view the evidence, as we must, in a light most favorable to the party prevailing below." *In re Estate of Mettee*, 10 Kan. App. at 187. In *Churchill v. Dill*, the Kansas Supreme Court stated:

"When it is shown that a testator had possession of his will for some months immediately prior to his death, and it cannot be found after his death, there is a presumption that he revoked it. This presumption may be rebutted by competent evidence." 145 Kan. 306, Syl. ¶ 1.

The parties have stipulated that Mary had possession of her will prior to her death. Thus, the presumption applies. On appeal, our only task is to determine whether there was competent evidence to rebut the presumption.

In *In re Estate of Mattee*, 10 Kan. App. 2d at 187, this court stated: "If the testator's intent to revoke is rebutted, the will is deemed lost." Therefore, the proponents of a lost will may satisfy their burden by presenting competent evidence that the decedent did not intend to revoke the will. *Churchill v. Dill*, 145 Kan. at 308-09.

Mahoney argues the only evidence actually challenging the presumption of revocation is the oral testimony of the Louis Kasper family. Mahoney would have us reweigh the evidence and pass on the credibility of the witnesses. To do so, however, would require us to abandon the familiar rule of appellate review that "[i]n reviewing the decision of a trial court, this court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court, and must disregard any conflicting evidence or other inferences that might be drawn therefrom." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 378-79, 855 P.2d 929 (1993). See *State v. Ratley*, 253 Kan. 394, 398, 855 P.2d 943 (1993). "The appellate courts are not to reweigh

the testimony or pass on the credibility of the witnesses." *McKissick v. Frye,* 255 Kan. 566, Syl. ¶ 8, 876 P.2d 1371 (1994).

Louis and John presented sufficient competent evidence of Mary's intent not to revoke her will to rebut the presumption. Numerous witnesses testified Mary was very upset with the members of the Jim Kasper family. So much so, that she executed a new will in 1991 excluding Mahoney and her siblings. Mahoney does not deny that Mary was upset with the Jim Kasper family, nor does she deny that Mary's disdain led to the creation of the 1991 will.

Mahoney contends that sometime between February 10, 1992, and January 7, 1993, the date that Mary entered the hospital and lost access to the will, Mary had a change of heart. Mary's actions, however, support the opposite conclusion. The incidents at the hospital and nursing home are perhaps the most illustrative. Mary was visibly upset, even distraught, by Jim's visit. She ordered that flowers sent by Jim be removed from the room. These acts do not support the conclusion that Mary intended to revoke her will, allowing the members of the Jim Kasper family to inherit a third of her estate through intestate succession. The trial court's finding that Mary's anger toward the members of the Jim Kasper family did not abate before her death is certainly supported by competent evidence.

The majority of Mahoney's arguments in support of applying the presumption of revocation stem from Louis and John's inability to account for the absence of the original will. However, their inability to account for the absence of the original is not dispositive. In *Churchill v. Dill,* the testator's will was last seen in his possession. After his death a search was made for the will, but it could not be found. Nonetheless, the court affirmed the lower court's holding that the presumption of revocation had been rebutted and allowed a copy of the will to be admitted to probate.

Ample evidence was presented to show Mary had a habit of misplacing important papers. In fact, on numerous occasions members of her family would have to search her house just to locate the bank statements necessary to do her taxes. Under the facts of this case, given the animosity Mary felt toward the Jim

Kasper family, and the fact John and Mary Vopat provided for Mary's business needs and day-to-day comfort and maintenance, the trial court's conclusion the will was lost will not be disturbed.

Louis and John's main evidence consisted of statements made by Mary that reaffirm the provisions of her will and rebut the inference she intended to revoke her will. Both John and Belinda presented evidence regarding conversations they had with Mary. The content of the two conversations is identical. John testified:

"A. [P]rior to her surgery I had a couple of conversations around Christmas time of last year that she wanted, two things that she was concerned about was the fact to make sure that she said you'll see to it that—she referred to them as the three would not receive under the will and I said yes. And she also had a concern that her great nieces would receive the items of personal property that was added under the '91 will."

Belinda recalled a conversation she had with Mary in December 1992. During that conversation, Mary said the members of the Jim Kasper family would get nothing under her will. In addition, Mary said Belinda's children, Mary's great-nieces, would be provided for in her will.

Mahoney entered timely and specific objections to the testimony of both John and Belinda. The trial court overruled those objections. On appeal, Mahoney contends that the trial court erred by allowing the testimony. According to Mahoney, the statements are inadmissible hearsay.

The Supreme Court has found "[e]ven in our most sharply contested will cases, declarations of the testator not made at or about the time the will was executed have been given evidential significance." *Fauser v. Jordan*, 152 Kan. 407, 411, 103 P.2d 862 (1940). In *Churchill v. Dill*, the Kansas Supreme Court was presented with a situation almost identical to the one in this case. The court cited the following passage from *Jackson v. Hewlett*, 114 Va. 573, 580-81, 77 S.E. 518 (1913), with approval:

" 'It is difficult to see how, in a case like this, the presumption of revocation could be overcome except by evidence such as that here relied upon. It is impossible for the beneficiaries under the will to say what became of it; they can only assert that, whatever may have happened to it, the testator did not revoke it, and that the will was made, duly executed, and its contents clearly shown and conceded. There is not a scintilla of evidence that it was revoked, nor is

there a cause suggested for revoking it. There is nothing to prevent its admission to probate as established except the presumption of revocation arising from the fact that it was last traced to the testator's possession and not found after search at his death. It must be generally the case, in such a status, that the best evidence, if not the only evidence, that can be adduced to rebut the presumption of revocation is that the testator's mind for many years contemplated a certain disposition of his property; that when he disposed of that property by will his mental attitude was precisely the same that it had been during those previous years, and that after he made such disposition his mind remained in the same state practically until his death, supplemented by the consistency of his mental attitude towards his various relatives. These are held to be proper facts and circumstances to be considered as against the presumption that such mental attitude and state of mind had changed. It would seem that the question as to whether there had been a change of mind could not be better determined than by the acts and declarations of the person whose mind is to be judged.' " 145 Kan. at 309-10.

Recognizing that the acts and declarations of the testator are "the best evidence, if not the only evidence, that can be adduced to rebut the presumption of revocation," we turn to respondent's assertion that the statements in question are inadmissible hearsay.

K.S.A. 1993 Supp. 60-460 defines hearsay evidence as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." According to K.S.A. 1993 Supp. 60-460, all evidence which fits within this definition is inadmissible, unless one of the many exceptions provided by the rule can be shown to apply. If the evidence of the statement does not fit within the definition of hearsay, our analysis ends and the evidence is admissible, provided the other rules of evidence are satisfied.

The evidence of the two statements made by Mary to Belinda do not fit within the definition of hearsay and were, therefore, admissible. The first statement was "they would get nothing." The matter asserted in this statement is that Mahoney, Jim, and Susan would get nothing from Mary through her will. However, the statement was not offered to prove the terms of Mary's will. It was offered to prove Mary did not have the requisite intent to revoke her will. Therefore, evidence of the statement was not offered to prove the truth of the matter stated, and it falls outside of the definition of hearsay as provided in K.S.A. 1993 Supp. 60-460.

Likewise, the second statement made by Mary to Belinda does not fit within the definition of hearsay. The exact statement is reflected in the following colloquy:

"Q. Did your aunt ever indicate to you that those children would be provided for?

"A. Yes.

"Q. In the will?

MR. HOLLAND: Objection, leading and suggesting.

THE COURT: Overruled.

MR. HOLLAND: Hearsay.

THE COURT: It's discussion concerning the will.

MR. HOLLAND: It's still hearsay.

"A. Yes."

The matter asserted in this statement is that Belinda's "children would be provided for in the will." Again, the statement was not offered to prove that Belinda's children would be provided for in the will. It was offered to prove that Mary did not intend to revoke her will. Therefore, in this context it is not hearsay.

The same reasoning would apply to John's testimony which establishes essentially the same point regarding Mary's lack of intent to revoke her will.

Although this ruling is dispositive, we also note the possible applicability of K.S.A. 1993 Supp. 60-460(l) should a stricter standard be applied and the above-mentioned conversations be deemed hearsay. K.S.A. 1993 60-460(l), an exception to the hearsay rule provides that the following type of hearsay statement is admissable:

"Unless the judge finds it was made in bad faith, a statement of the declarant's (1) then existing state of mind, emotion or physical sensation, including statements of *intent*, plan, motive, design, mental feelings, bodily pain and bodily health, but not including memory or belief to prove the fact remembered or believed, when such a mental or physical condition is in issue or *is relevant to prove or explain acts or conduct of the declarant*" . . . . (Emphasis added.)

At oral argument, appellant argued that *Thompson v. Norman,* 198 Kan. 436, 444, 424 P.2d 593 (1967), and *Laterra v. Treaster,* 17 Kan. App. 714, 720, 844 P.2d 724 (1992), would bar the application of 60-460(l) to this case. We disagree.

*Thompson* involved a purported statement by a person, two weeks after an accident, that he was driving the automobile at

the time of the collision. On the issue of the applicability of 60-460(l), the court found the state of mind of the declarant (who was not a party to the action) two weeks after the accident was immaterial to the issues involved. The court then found other hearsay exceptions which might have been applicable, were not properly pursued, or were within the trial judge's discretion to allow under the facts of the case.

*Laterra* dealt with statements by a decedent that he intended to pay for his son's college education. Since the court approved the admission of this statement under 60-460(l), we do not understand Mahoney's citation of the case as support for her position.

Louis and John presented competent evidence to rebut the common-law presumption that the will had been revoked. Moreover, the provisions of the will were clearly and distinctly proven. The trial court's decision was well supported by the evidence and will not be disturbed on appeal.

Affirmed.