NOT DESIGNATED FOR PUBLICATION

No. 121,892

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of
NANCY ANN BOONE.

MEMORANDUM OPINION

Appeal from Saline District Court; PAUL J. HICKMAN, judge. Opinion filed November 13, 2020. Reversed and remanded with directions.

*Ann M.E. Parkins* and *Lauren G. Hughes*, of Wise & Reber, L.C., of McPherson, for appellant the Estate of James Dean Boone.

*Joseph A. Allen* and *Charles C. Lindberg*, of Allen & Associates Law, LLC, of Minneapolis, for appellees Amy Meredith and Terry Farrington.

Before ARNOLD-BURGER, C.J., MALONE, J., and WALKER, S.J.

PER CURIAM: After Nancy Ann Boone died, her widower, James Dean Boone (known as Dean), initiated probate proceedings claiming that Nancy died intestate and identifying her two adult children—Amy Meredith and Terry Farrington—as her other potential heirs. During protracted proceedings in the district court, Amy and Terry eventually asserted that Nancy had validly executed a will which Dean had secreted and ultimately destroyed. The district court held an evidentiary hearing and found that (1) a valid will had existed; (2) Dean had secreted that will; (3) Dean's failures to comply with procedural rules in his role as administrator of Nancy's estate caused substantial loss to Amy and Terry, impaired their substantial rights, and warranted denying Dean's requests for statutory spousal rights to Nancy's estate; and (4) all assets remaining in Nancy's

1

estate should be transferred to Amy and Terry. Dean's Estate, which was substituted as a party after Dean died while this case was in the district court, appeals.

For the reasons stated in this opinion, we hold that (1) the district court erred as a matter of law by finding that Nancy had executed a valid will and that Dean had executed a consent to the will and (2) the district court erred by denying Dean his statutory spousal allowances and elective share based solely on his procedural failures as administrator of the estate. We remand the case to district court to resolve all other issues.

## FACTUAL AND PROCEDURAL BACKGROUND

Nancy and Dean married on August 11, 2001. Both had adult children from a prior marriage. Nancy and Dean kept their finances separate, including filing separate income tax returns. Beginning in 2005, attorney George Yarnevich began preparing Nancy's income tax returns, which he did for the rest of her life.

By 2010, Dean's relationship with Nancy's adult son, Terry, had soured, and Dean no longer allowed Terry into the home Dean and Nancy shared. In 2011, at Nancy's request, Yarnevich prepared a transfer on death deed and a will that included a consent for Dean to sign giving up his statutory spousal rights to receive under her estate, including homestead rights. Yarnevich mailed a preliminary draft of the will and the deed to Nancy on October 31, 2011.

Nancy came to Yarnevich's office and executed the transfer on death deed for the home she and Dean shared. Yarnevich's secretary notarized the deed and it was filed with the register of deeds. Dean also signed that deed, which transferred the home upon Nancy's death to Amy and Terry. The record on appeal has no copy of the signed transfer on death deed, only an unsigned draft copy, but the parties do not dispute the execution or existence of this deed.

2

As for the will, Yarnevich's general practice was to prepare a draft of a will or other estate planning documents and send them to the client for review. At that point, the client could request any changes, which Yarnevich would make, and the client would review another draft before signing. Upon receiving a signed copy of the will, Yarnevich would keep it in the client's file, and he always advised clients "to put [wills and deeds] in a safe place, like a vault in their home, or something similar." Nancy never asked Yarnevich to change the draft he sent her. Although Yarnevich emphasized to Nancy that the will "needed to be signed," Yarnevich never saw or received a signed will from Nancy or a consent to the will signed by Dean.

In 2013 or 2014, Dean's relationship with Amy, Nancy's adult daughter, deteriorated to the point that Dean no longer allowed Amy or her family into Dean and Nancy's home. But on February 8, 2013, Nancy gave Amy a note, dated the same day, that read:

> "Hi!
> "My stroke on December 15th was not a warning that I liked.
> "So I have tried to cover some ground since, before I am put in the mausoleum.
> "Here is a copy for you. I will give Terry a copy, and the original will be put in the Unlocked safe in that messy bedroom # 4 Downstairs.
> "I asked Dean to sign, and he did with no questions asked. As for my thoughts, I and your Dad raised <u>Good</u> kids. I feel you two would treat Dean fairly if I go first.
> "Love you!
> "Mom."

The note itself does not reference any specific documents. But Amy testified the note was attached to an unsigned draft of a will, an unsigned spousal consent form, and an unsigned draft of a transfer on death deed. The will essentially bequeathed all of Nancy's property to Amy and Terry in equal shares. Terry also testified that Nancy gave him an unsigned copy of the will and said there was a will in the safe. Amy and Terry

3

knew there was a safe built into a wall in a basement bedroom in Nancy and Dean's home. According to Amy, the safe was left unlocked because only she knew the combination and Nancy could not operate it. Neither Terry nor Amy ever saw a signed version of Nancy's will or Dean's spousal consent.

Dean's relationship with Terry and Amy continued to decline. At one point in 2016, Amy could not reach Nancy or Dean for several days, so she went to their home. Nancy eventually answered the door and let Amy into the entry area, but Dean came out of a bedroom and screamed that she was not welcome there. That was the last time Amy was inside the home before Nancy's death.

Nancy died on April 24, 2017. Amy asked Dean if she could come to the house and get Nancy's will, but Dean would not allow Amy into the house, saying that he would find the will and he did not want Amy coming to the house unless she had an appointment. In May 2017, Terry met with Dean "to see what his intentions were as far as remaining in the house and to attempt to get access to the safe" to retrieve Nancy's will and other papers. Dean said the safe had been broken into and its contents were gone. He allowed Terry into the living room and Nancy's bedroom, but not the basement.

*Probate proceedings in district court*

On May 26, 2017, Dean filed a pro se petition seeking his own appointment as administrator of Nancy's estate under Kansas' Simplified Estates Act, alleging that Nancy had died intestate and identifying Nancy's heirs as himself, Amy, and Terry. Terry received a copy of the petition in the mail on June 5, 2017.

On August 29, 2017, counsel for Terry and Amy entered his appearance. Terry and Amy moved to dismiss the petition or refuse letters of administration, arguing that they had not been served with the petition, no hearing on the petition had been set, and

4

appointing an administrator was unnecessary because Nancy passed all of her assets and real property to them outside her estate. Terry and Amy did not allege that a will existed, and they acknowledged "[t]hat no Last Will and Testament has been brought forward." Dean retained counsel and it appears from the record on appeal that a hearing was set on his petition and then continued to October 9, 2017.

On October 4, 2017, however, Dean filed a second petition, seeking a homestead allowance of $50,000 under K.S.A. 2019 Supp. 59-6a215 and an elective share of Nancy's augmented estate under K.S.A. 59-6a202. Dean also sought a spousal allowance of furniture, household goods, apparel, and one year's worth of fuel under K.S.A. 2019 Supp. 59-403(a) and a spousal allowance of $50,000 cash under K.S.A. 2019 Supp. 59-403(b). The same day, Dean responded to Terry and Amy's motion to dismiss the petition for appointment of administrator. Again asserting that Nancy had died intestate, Dean argued that appointment of an administrator was appropriate because not all of her property had passed to her children outside her estate and because Dean sought his statutory spousal allowances and elective shares.

On October 26, 2017, the district court filed an "Agreed Order Appointing Administrator" appointing Dean administrator of Nancy's estate and granting letters of administration. After finding that Nancy had died intestate, the district court noted that Terry and Amy had "no objection to the appointment of James Dean Boone as administrator." The order was approved and signed by all counsel.

Not much happened over the next nine months. On July 19, 2018, Terry and Amy filed a "Motion" containing four separate counts. In Count I, Terry and Amy alleged that Dean had failed to provide proper notice of the probate proceedings to them and to potential creditors and he had failed to timely petition for spousal elective shares. They also contended Dean had failed as administrator to file the required inventory and valuation, letters of administration, and the oath of the administrator. Based on these

5

procedural failures, Amy and Terry asked the district court to dismiss the probate proceedings initiated by Dean and to bar all of Dean's claims against the estate.

In Count II, Terry and Amy alleged for the first time that Dean was secreting from the district court Nancy's valid last will and testament, purportedly the one prepared by Yarnevich, and his own spousal consent to that will, which were last known to be in the safe in Dean's control. Terry and Amy asked the district court to allow them to submit parol evidence to prove the will's validity and thereafter to enter the will into probate. In Count III, they alleged that if the district court found the will prepared by Yarnevich invalid, Nancy had executed a valid will before her marriage to Dean that, although missing, would be valid and should be admitted into probate.

In Count IV, Terry and Amy asked for a determination of Nancy's augmented estate. According to Terry and Amy, by the time Dean filed his untimely request for his spousal shares and elected to receive his spousal rights, all real property and all liquid assets owned by Nancy had been conveyed to them by transfer on death deeds or payable on death accounts. Thus, they asked the district court to hold that the personal property remaining in the home Nancy and Dean had shared constituted the entire estate and determine the disposition of that property.

At a hearing on July 30, 2018, the district court ordered Dean to vacate the residence he had shared with Nancy on or before September 1, 2018, and to file an inventory with the court on or before the same date. On August 13, 2018, Dean filed his oath of administrator and an inventory and valuation of Nancy's assets as of her death. Dean valued Nancy's "Miscellaneous Property," which was described as "Household goods, furnishings, and wearing apparel," at $500, constituting the total probate assets. Dean itemized non-probate assets, consisting of insurance, jointly held property, and transfer or payable on death assets, and valued the non-probate assets at $1,499,694.97. Terry and Amy objected to the inventory and valuation.

6

On August 27, 2018, Dean responded to Terry and Amy's four-count motion. In the response, Dean maintained that he had "no knowledge of any executed Last Will and Testament and Dean never signed a Spousal Consent." In an attachment to the response, Dean claimed his elective share of the Nancy's augmented estate amounted to $233,667, and he claimed a homestead allowance of $50,000 and a spousal allowance of $50,000 for a total claim against the estate in the amount of $333,667.

On September 17, 2018, Dean filed proof of publication of notice to potential creditors of Nancy's estate. On September 28, 2018, the district court filed an agreed-upon journal entry noting that Dean still had not turned over the residence and ordering him to do so immediately and to provide a full inventory of all items removed from the residence. The district court also ordered that once Terry and Amy had possession of the house, they were to provide a full inventory of the items remaining in the house and to identify "any items they know should have been in the residence."

When Amy and Terry got into the house in October 2018, they found that the safe had been moved from its spot in the basement bedroom to the laundry or utility room; the safe was empty and sat next to a cross-cut paper shredder that was "jam-packed full of paper shredding." They also discovered that items they remembered being in or at the house were no longer there but were not accounted for on Dean's August 2018 inventory. These items included vehicles, paintings, and several pieces of jewelry, which Terry estimated were worth $30,000 to $40,000. In addition, the condition of the home had changed dramatically since the last time Amy or Terry had been inside. Amy described the house as having "been ransacked" and "trashed," with feces and personal hygiene products "all over" and mice, roaches, and bedbugs "everywhere."

Dean died on October 6, 2018. On December 10, 2018, Dean's counsel moved to substitute Dean's Estate for Dean for purposes of the litigation between the parties.

7

Although this motion was later granted, the record does not reflect that the district court has appointed a new administrator to Nancy's estate now that Dean is deceased.

*Evidentiary hearing and the district court's decision*

The district court held an evidentiary hearing beginning on December 12, 2018. Terry and Amy called Yarnevich to testify about his relationship and interactions with Nancy. Yarnevich agreed that Nancy and Dean filing separate income tax returns throughout their marriage was "consistent with their desires to keep their estates and [their] money separate." He also testified that Nancy had told him that she and Dean kept their accounts and property separate even though doing so was more expensive. Yarnevich testified about his preparation of a will, spousal consent, and transfer on death deed for Nancy and his general practices when estate planning with clients, as detailed above. Although Yarnevich kept signed copies of wills in his client files, he had checked Nancy's file and found no copy of a signed will. Yarnevich testified repeatedly that he did not know whether Nancy had ever signed the will he drafted for her.

Next, Amy testified that Nancy and Dean maintained separate bank accounts, which she knew because she had helped Nancy with her finances since 2001. Although Amy testified about the handwritten note and unsigned copy of a will that Nancy had given her in 2013, Amy conceded that she had never seen a signed copy of that will or a signed spousal consent. But Amy testified that the unsigned copy of the will Nancy gave her reflected what Nancy had told Amy would happen upon Nancy's death. The district court admitted into evidence the handwritten note and the unsigned copies of the will, spousal consent, and transfer on death deed. The district court also admitted into evidence three pictures: one of the former location of the safe, as identified in Nancy's handwritten note; one of the safe as they found it empty in the laundry room; and one of a paper shredder they found beside the safe.

8

After explaining the condition of the house as she and Terry found it in September 2018, Amy testified that Dean lived alone in the home after Nancy died but that his daughter later moved into the home as well. Because of scheduling conflicts, after Amy's testimony, the district court continued the hearing until January 23, 2019.

When the hearing resumed Terry testified that Nancy and Dean did not commingle their finances, a practice consistent with the unsigned will Nancy had given him. Like Amy, although Terry testified that Nancy told him there was a signed copy of a will in the safe, Terry acknowledged that he never saw a signed will and never saw Nancy sign a will or saw Dean sign a consent to a will. After Terry's testimony, Amy and Terry rested and the parties made closing arguments. The district court asked counsel to submit proposed findings of fact and conclusions of law and it took the matter under advisement.

The district court filed its memorandum decision and order on July 19, 2019. The district court made detailed findings of fact and conclusions of law. In particular, the district court found that a "Last Will and Testament did exist and has been secreted from the heirs and more importantly, from this Court." The district court also found that Dean's procedural failures as administrator of Nancy's estate "affected the substantial rights" of Terry and Amy and, as a result, Dean's claims on Nancy's estate "should be barred." The district court denied Dean's petition for spousal election and share and ordered that all assets of Nancy's estate be transferred to Terry and Amy. Dean's Estate timely appealed.

DID THE DISTRICT COURT ERR BY FINDING THAT NANCY HAD EXECUTED A VALID WILL?

In its first issue, Dean's Estate argues that there was insufficient evidence to support the district court's finding that a valid will existed including Dean's consent and that Dean had secreted that will. It points out that no witnesses testified that Nancy executed the will or that Dean executed the spousal consent, so no evidence showed that Nancy executed her will in compliance with the statutory requirements of witnesses and

9

notarization. In response, Terry and Amy contend that the evidence supports the district court's conclusion that Nancy executed a valid will that Dean then secreted.

> "Where the trial court has made findings of fact and conclusions of law, the appellate court's function is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *In re Estate of Farr*, 274 Kan. 51, 58, 49 P.3d 415 (2002).

The parties argue this issue extensively, among other things focusing on whether the unsigned will paralleled Nancy's asserted testamentary intent. But this issue is much simpler to resolve. Although the district court's memorandum decision and order did not acknowledge it, it is well established that a document must comply with certain formalities to be enforceable as a "will" under Kansas law. See *In re Estate of Reed*, 236 Kan. 514, 522, 693 P.2d 1156 (1985) (noting that although a document expressed the decedent's wishes, "it is lacking in the essential requirements necessary for a valid will"); *In re Reed's Estate*, 229 Kan. 431, 434, 625 P.2d 447 (1981) ("Prior to statehood, the Territorial Legislature of 1859 adopted an act providing that except for oral wills, all wills 'must be in writing, witnessed by two competent witnesses, and signed by the testator.'"). Indeed, "[t]he contents of the proffered will need not please the court, the testator's relatives, or anyone else for that matter, so long as the statutory requirements are followed." *Cresto v. Cresto*, 302 Kan. 820, 831, 358 P.3d 831 (2015).

"Whether a will satisfies the statutory formalities is a question of law subject to unlimited appellate review." *In re Estate of Field*, 55 Kan. App. 2d 315, 321, 414 P.3d 1217 (2018). K.S.A. 59-606 sets forth Kansas' requirements—or statutory formalities—required for valid execution of a will:

10

"Every will, except an oral will as provided in K.S.A. 59-608 and amendments thereto, shall be in writing, and signed at the end by the party making the will, or by some other person in the presence and by the express direction of the testator. *Such will shall be attested and subscribed in the presence of such party by two or more competent witnesses, who saw the testator subscribe or heard the testator acknowledge the will.* Such will, at the time of its execution or at any subsequent date during the lifetimes of the testator and the witnesses, may be made self-proved, and the testimony of the witnesses in the probate of the will may be made unnecessary by the acknowledgments of the will and the affidavits of the testator and the attesting witnesses." (Emphasis added.)

Here, no one argued that Nancy made an oral will; the focus was on the will Yarnevich drafted and unsigned copies of the will that Nancy gave to Amy and Terry. As Amy and Terry note in their brief, K.S.A. 59-2228 allows a lost or destroyed will to be established and accepted for probate "if its provisions are clearly and distinctly proved." But K.S.A. 59-2228 only applies to documents that meet the formalities of a will; it is not a way to circumvent those requirements. To be considered a valid will, even a lost or destroyed will admitted under K.S.A. 59-2228, a document must have been executed in compliance with K.S.A. 59-606.

*In re Estate of Kasper*, 20 Kan. App. 2d 309, 887 P.2d 702 (1994), provides an example of lost or destroyed will being admitted to probate under K.S.A. 59-2228. In that case, the evidence showed that Mary Kasper executed a will drafted by her attorney on April 25, 1991. Mary asked her brother, Louis, to place the original will in her safety deposit box at her bank. Based on that request, Louis deposited an envelope marked "'Legal Documents'" into the safety deposit box. 20 Kan. App. 2d at 310. When Mary died the following year, Louis and his son, John, discovered that the envelope in the safety deposit box contained only a copy of Mary's will, rather than the original will. After searching Mary's house, they were unable to locate the original will.

11

Louis and John petitioned to admit the copy of the will into probate and another heir objected. At the hearing, the parties "stipulated that the will dated April 25, 1991, was signed by Mary and properly witnessed by two subscribing witnesses." 20 Kan. App. 2d at 311. The district court found the evidence was sufficient to rebut the common-law presumption that when a testator dies and the original will cannot be found, the testator intended to revoke the original will. Thus, the district court admitted the copy of the will into probate under K.S.A. 59-2228. On appeal, this court agreed with the district court and held "Louis and John presented competent evidence to rebut the common-law presumption that the will had been revoked." 20 Kan. App. 2d at 320.

Conversely, *In re Estate of Day*, 12 Kan. App. 2d 668, 753 P.2d 1296 (1988), is an example of a case where this court found the evidence insufficient to admit a lost or destroyed will into probate under K.S.A. 59-2228. In that case, the evidence showed that B.H. Day executed a will prepared by his Kansas attorney on December 10, 1979, and he placed the original will in his safety deposit box. Day executed a codicil to the will on June 3, 1985, but the original codicil was retained in his lawyer's office. The following year, Day executed a living trust that was prepared by an Oklahoma lawyer and transferred most of his assets into the trust. The trust instrument did not invalidate the will.

After Day's death, the safety deposit box was opened, and it was empty. The executed will was not produced, and no direct explanation of what happened to it was offered. Two of Day's sons tried to admit an unsigned copy of the will into probate along with the original codicil, but a third son objected. The district court found that proof of the codicil was sufficient to establish proof of the will, so the district court admitted the unsigned copy of the will into probate under K.S.A. 59-2228. On appeal, this court reasoned that the existence of the codicil could be considered by the district court in deciding whether the common-law presumption of revocation was overcome, but it was not conclusive proof to establish the validity of a will. 12 Kan. App. 2d at 671. This court

12

held that "[t]he proponents of the copy of the will did not present sufficient evidence as a matter of law to overcome the presumption of revocation." 12 Kan. App. 2d at 672.

Here, the question is not whether Nancy validly executed the will prepared by Yarnevich only to find that it was later lost or destroyed; the question is whether Nancy ever validly executed the will in the first place. To find that Nancy validly executed the will prepared by Yarnevich, the district court had to find that two competent individuals witnessed Nancy sign the will. See K.S.A. 59-606. But as Dean's Estate argues, the district court heard no evidence that anyone witnessed Nancy signing a will. Had two witnesses come forward to testify that they witnessed Nancy execute a will that was later lost or destroyed, then perhaps the will could have been admitted under K.S.A. 59-2228. But the record here contains no such evidence.

The unsigned copy of the will admitted into evidence showed that the purported witnesses for both the will and the consent would be Yarnevich and his secretary, Susan M. Unruh. At the evidentiary hearing, Yarnevich testified that he did not know whether Nancy ever signed the will he prepared or any other will. Unruh was not called to testify at the hearing. Amy testified that she had never seen a signed copy of the will and that Nancy did not sign it in front of her. Likewise, Terry testified that he never saw a signed copy of the will or saw Nancy sign any will. Although Nancy's handwritten note to Amy in 2013 referred to Dean signing something, it could have been referring to the transfer on death deed, which Dean never disputed that he signed.

There is a reason that Kansas law requires a written will to be signed before two competent witnesses to be valid—it is for cases like this one. In deciding whether a lost or destroyed will may be admitted into probate under K.S.A. 59-2228, the district court gets to be the fact-finder. But the district court cannot find the existence of a valid will with no evidence that the will was executed in accordance with the basic statutory requirements set forth in K.S.A. 59-606. Without any evidence from witnesses as

13

required by K.S.A. 59-606, we hold the district court erred as a matter of law by finding that Nancy had executed a valid will and that Dean had executed a consent to the will.

## DID THE DISTRICT COURT ERR BY DENYING DEAN HIS STATUTORY SPOUSAL ALLOWANCES AND ELECTIVE SHARE?

Dean's Estate also argues that the district court erred when it denied Dean his homestead allowance, spousal allowances, and spousal elective share of Nancy's estate based on his procedural failures as administrator of the estate. Before his death, Dean had petitioned the district court seeking a homestead allowance of $50,000 under K.S.A. 2019 Supp. 59-6a215 and an elective share of Nancy's augmented estate under K.S.A. 59-6a202. Dean also sought a spousal allowance of furniture, household goods, apparel, and one year's worth of fuel under K.S.A. 2019 Supp. 59-403(a) and a spousal allowance of $50,000 cash under K.S.A. 2019 Supp. 59-403(b). After hearing the evidence, the district court denied all these claims based on its finding that Dean's procedural failures as administrator of Nancy's estate affected the substantial rights of Terry and Amy. Dean's procedural failures as administrator of Nancy's estate included his failure to provide timely notice of the probate proceedings to Terry and Amy as well as his failure to provide timely notice to creditors. He also failed to timely file the required inventory and valuation, letters of administration, and the oath of the administrator.

Terry and Amy argue that Dean's failures to comply with probate procedure caused them substantial harm because Dean remained in the home during the delays and the value of the home plunged during that time. They also contend that Dean's requests for an elective share and for the homestead allowance were untimely and his request for an elective share cannot be granted because of unresolved disputes about the inventory and amount of the augmented estate. Finally, they argue that the district court had full discretion to determine whether to award a spousal allowance and a reasonable person could agree with the district court's decision not to do so.

14

"To the extent that we are required to look to the provisions of the Kansas Probate Code, K.S.A. 59-101, et seq., the scope and range of permissible orders in probate proceedings involves issues of law over which an appellate court has unlimited review." *In re Estate of Pritchard*, 37 Kan. App. 2d 260, 270, 154 P.3d 24 (2007). And statutory interpretation presents a question of law over which appellate courts have unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

The only legal authority the district court cited in its memorandum decision and order for stripping Dean of his statutory spousal allowances and elective share is *In re Estate of Rickabaugh*, 305 Kan. 921, 390 P.3d 19 (2017), but the district court did not discuss that case or provide a pinpoint citation to the portion of that case on which it relied. But that case does not involve the blanket denial of statutory spousal claims to an estate, nor does it authorize such denial as punishment for an administrator's failure to comply with procedural rules in probate proceedings. See 305 Kan. at 922-37. Rather, *In re Estate of Rickabaugh* addresses whether defects in following probate procedure can invalidate the probate proceedings, and the Kansas Supreme Court reiterated that "defects in probate procedures *do not invalidate proceedings* unless the defects impair the substantial rights of the parties." (Emphasis added.) 305 Kan. at 931.

A close reading of *In re Estate of Rickabaugh* reveals no support for the district court's decision to bar Dean's statutory claims to Nancy's estate because he failed as administrator to comply with procedural probate rules. If Dean's failures as administrator impaired Terry and Amy's substantial rights, *In re Estate of Rickabaugh* would authorize invalidating the proceedings and removing Dean as administrator, but it does not authorize the district court's actions in this case. Of course, because Dean is now deceased it is obvious that he must be replaced by someone as administrator of Nancy's estate. But Dean, and presumably Dean's heirs, still have a claim to the statutory spousal allowances and elective share of Nancy's estate.

15

Moreover, Amy and Terry provide no legal authority that allows a district court to issue a blanket denial of a surviving spouse's statutorily guaranteed claims on a deceased spouse's estate because the surviving spouse, acting as administrator, breaches probate procedure. Rather, their main argument seems to be that Dean's request for an elective share was untimely and there were other valid reasons for the district court to deny Dean's claims. Whether Dean's request for an elective share was timely is another matter. But we hold the district court erred by denying Dean his statutory spousal allowances and elective share based solely on his procedural failures as administrator of the estate.

In the rest of their briefs, the parties argue over whether Dean should have received a homestead allowance, spousal allowances, and a spousal elective share under the respective statutes. But the district court never made any findings to resolve these issues on their merits; instead the district court resolved all the issues with its erroneous findings that Nancy had executed a valid will to which Dean consented and that Dean's administrative failures warranted a blanket denial of all his claims. We decline any invitation to resolve these issues for the first time on appeal because there appear to be some factual disputes and the record is not clear enough to resolve other issues.

For example, the elective share of a surviving spouse is calculated as a percentage of the augmented estate. K.S.A. 59-6a202(a)(1). But here the district court never resolved the dispute over the value of the augmented estate. Although Dean's Estate asserts in its brief that "the calculation of the augmented estate and Dean's percentage of the augmented estate went uncontroverted" at trial, that assertion is belied by the record on appeal, which reflects that the parties at the hearing disputed the value of the augmented estate. On another issue, K.S.A. 2019 Supp. 59-403(b) states that a spouse's allowance will not exceed $50,000 "with the exact amount of such allowance to be determined and ordered by the court." This finding calls for the exercise of the district court's discretion and should not be made by an appellate court for the first time on appeal.

We offer no opinion on whether Dean is entitled to receive a homestead allowance, spousal allowances, or a spousal elective share of Nancy's estate. Instead, the better practice is to remand the case to the district court for full consideration of Dean's statutory spousal rights and any other issues between the parties. See *Jamerson v. Heimgartner*, No. 121,681, 2020 WL 4555793, at *5 (Kan. App. 2020) (unpublished opinion) (declining invitation to address issues for the first time on appeal where the district court erroneously decided the case on other grounds). That way, the parties will have the chance to fully develop their arguments and the district court will have the discretion to take evidence as needed and make complete findings of fact and conclusions of law on the remaining issues.

Reversed and remanded with directions.